IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SARAH WEEDEN,

                Petitioner,

       vs.

DEBORAH K. JOHNSON, Warden,
Central California Women's Facility,

           Respondent.

No. 2:13-cv-02667-JKS

MEMORANDUM DECISION

Sarah Weeden, a state prisoner represented by counsel, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Weeden is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at the Central California Women's Facility. Respondent has answered, and Weeden has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On October 15, 2008, Weeden, along with Sirtice Melonson, Ryan Moore, and Janee Hill, was charged with the murder of Navnil Chand, attempted murder of Deovinesh Kumar, and attempted second-degree robbery of Chand and Kumar. The information also alleged as to each count that a principal was armed in the commission of the crimes.

On direct appeal of her conviction, the California Court of Appeal described the following facts underlying the case against Weeden:

**The Prosecution's Case**
        One night in July 2005, 17-year-old Navnil Chand, his brother Shavnil Chand, and two friends, Ashneel Prakash and 22-year-old Deovinesh Kumar, were riding around in Kumar's Toyota Camry.[FN2] The vehicle was new and equipped with an in-dash DVD player, chrome rims, and tinted windows. While driving, they saw four teenaged girls walking down the street.

> FN2.  For the sake of clarity we will refer to the Chand brothers by their first names.  Those minors whose identities are not being disclosed herein will be referred to by their first names or initials only.

The group of girls consisted of 14 year olds Angela G. and Weeden, and sisters Christina W. and J.W.[FN3]  The boys in the Camry stopped next to the girls.  The two groups conversed.  Kumar invited the girls to "party" with them, saying his group had beer and "weed."

> FN3.  Angela and Weeden were best friends.  Angela was a cousin of J.W., Christina, and 14-year-old John W.  Those cousins were also cousins of 16-year-old Ryan Moore and 17-year-old Janee Hill.  John and Weeden dated during middle school.

The girls demurred and Angela gave Weeden's cell phone number to Navnil.  After Navnil said he would call Weeden's number, the boys drove away.

The girls walked back to Christina's home.  A group of boys hung out across the street.  John was outside with his friends, including Ryan Moore and S.M., defendant Melonson's brother.  Weeden and Angela talked with the group of boys.  Weeden told them about meeting Navnil and Kumar and that they had said they had beer and weed.

Ryan Moore and Weeden talked about robbing the boys.  Moore asked if Weeden had their phone number; she told him they had her number.  According to Weeden, "[T]he Hindu guy's phone number was restricted."

A few days later, Moore told Hill that he was considering robbing someone.  Moore stated he was going to rob "[s]ome East Indian boys" for "weed and money."

During this period, Angela asked Weeden if they were going to do the robbery.  Weeden replied, "[Y]es."  Angela told Weeden not to do it.  According to Weeden, the robbery would take place at Vintage Park, and would yield money and drugs.

John heard from Weeden and Angela that there was going to be a robbery.  Weeden asked him to rob the boys they had met the week before.  John refused.

A week later, on August 5, 2005, Weeden called Hill and asked for Angela; Hill told her Angela was at home.  Although Angela was supposed to see Weeden that day, Angela's mother forbade her from leaving the house.

That evening, Weeden called Hill and talked about boys that kept "crank calling" her  phone; she wanted to have them beaten up.  Weeden told Hill the boys were trying to get her to go to a motel.  Weeden also told Hill she was going to have Moore rob the boys, who kept calling her.  She told Hill she met the boys while walking with Hill's cousins.  Moore planned the robbery, which would net Weeden weed and money.

Hill warned Weeden that robberies can go wrong and bad things can happen.  Weeden responded, "[O]kay."

Also that evening, Navnil called Kumar and asked him to call Weeden's cell phone.  Although Kumar called, no one answered.  Navnil later called Kumar and told him he needed money; he said it was urgent but did not tell him what it was for.  Kumar owed him $60.  The duo agreed to meet at an ATM to get the money.

Kumar picked up Navnil, and as the pair drove to the ATM, Navnil talked to someone on his cell phone, trying to get a room at the Motel 6.  Navnil used Kumar's phone to call the girl he was meeting.  Kumar did not hear Navnil mention drugs or alcohol.

Navnil, while talking on the phone, directed Kumar's route.  Navnil told Kumar the girls they met previously were going to meet them at the park.  Navnil made numerous calls.

Kumar parked on a side street adjacent to the park, leaving his engine running.  Navnil spoke to a girl who said, "I'll be there in two to three minutes."  Navnil replied, "I'm waiting for you over here by the park."  Navnil told Kumar they should leave the car because the girls told them to go to the park.

**The Shooting**

A few seconds later, two men appeared at the front passenger side of the car.  The window was down about five inches.  One of the men stuck a handgun in the window and said, "Mother fuckers, get out of the car."

Thinking the man wanted the car, Kumar began to open his door; Navnil did the same.  As Kumar opened the door, the man fired a shot into the car.  Kumar saw blood and thought his hand had been cut by broken windshield glass.  He put the car in drive and sped off, yelling for Navnil to call the police.

As he drove away, Kumar heard more gunfire.  He pulled into a store parking lot and ran inside the store.

A store security guard saw Kumar's Camry speeding into the parking lot.  Kumar jumped out and yelled that he had been shot.  The store clerk saw Kumar enter the store and fall to the floor.  Kumar then got up and went back outside.

Kumar went back to the car and shook Navnil, who did not respond.  The security guard saw Navnil sitting upright in the passenger seat, barely breathing.  Kumar returned to the store and again fell to the floor.  The clerk went to Kumar's aid and saw that part of Kumar's finger was gone.  Kumar said he did not want to die.  The clerk locked the store and the security guard called the police.

**Witnesses in the Park**

The evening of the shooting, 13 year olds Brittany R. and Vaughn T. sat on playground equipment in the park.  A car pulled up and two men walked up to the children.

One of the men was shorter and heavyset, with short hair and wearing gold teeth.  This man also had light skin.  Brittany thought "[h]e looked like he was mixed with black and white."  Vaughn thought the shorter man looked mixed "Black Mexican."  Brittany thought the man was 16 or 18 years old, and maybe five feet six inches tall.  He wore a red shirt or sweater and sweat pants or basketball shorts, and carried a backpack.

The second man was African American.  He was tall and skinny, with braids and a darker complexion.  The man wore a "do rag," a kind of head wrap, on his head.  Both men carried cell phones.[FN4]

3

FN4. Neither Brittany nor Vaughn identified Melonson from the photographic lineup or at trial.

The pair sat down next to Brittany and Vaughn.  The taller man spoke to a girl on his cell phone.  The shorter man said, "[W]e're going to make a lick [commit a robbery]" to the person on the phone.

One man asked the other, "[A]re these guys gonna get out of the car or what?" The shorter man told the taller man that the men in the car were Indian, and that Indians do not carry guns, only Pakistanis do.

The men asked Brittany and Vaughn to go over to the car and distract the occupants while they came up from behind.  Brittany refused.  Vaughn told a detective the taller man said, "They ain't trying to get out of the car, let's go."  The shorter man at first demurred, but after the taller man insisted, they walked toward the car, approaching the passenger side.

The shorter man stood close to the window; the taller man stood back by the trunk.  The shorter man pointed a gun and began shooting into the car through the passenger window.  Brittany heard two or three shots; she did not see anyone get out of the car.  Vaughn heard three or four shots and saw the shorter man shooting at the person inside the car on the passenger side.

After the shooting, the two men ran. Brittany and Vaughn ran to Brittany's house.

Renice Trujillo, who lived in a court near the park, also heard gunshots that evening.  She looked out her window and saw two people walking quickly into the court. They were male, tall and lanky.  One wore layered red and white shirts.  One of them was talking into a cell phone and mentioned the park.  Another neighbor heard five loud pops.

Doug Reid, another neighbor, heard "extremely loud" gunshots that he thought sounded like a large-caliber handgun.  He looked out his window and saw two young men walking quickly down the court.  One of the men looked Hispanic; the other looked African American.  The Hispanic man wore a dark shirt and a backwards baseball cap, and carried a backpack.  The other wore a red sweatshirt and a do-rag.

Reid saw the two men jump onto the wall at the end of the court.  The men looked around and the Hispanic man dropped the backpack, which appeared to be heavy.  The men jumped off the wall and walked away.  Reid described the men as suspicious; he also identified the backpack and sweatshirt found next to the wall as those worn by the men.

Daniel Albano, another nearby resident, heard three or four gunshots.  He looked out the window and saw two individuals running toward his house.  One wore a red or orange sweatshirt and long shorts, and was around five feet seven inches tall and slender. The other person was dressed in black.

Finally, Thorlakur Tryggvason, who also lived in the area, heard five gunshots coming from the park.  Looking out his window, he saw one female and five males running from the park.  Two of the males ran past his house, entered the next cul-de-sac, and jumped the fence at the end of the court.  He described the males as teenagers, either Asian or Hispanic and African American, of average height and build.

4

**Weeden's Activities the Night of the Murder**

Weeden called Hill repeatedly that night to have her get in touch with Moore. Weeden asked Hill to call Moore and find out where he was. Moore said he was on his way home. Weeden called later, again asking where Moore was. Moore said he was getting a ride from defendant Melonson and did not seem surprised that Weeden wanted to know where he was.

While Hill spoke with Weeden, the boys she had met that night kept "buzzing in" on Weeden's phone. Weeden told Hill to ask Moore whether he was at the park. Moore said he was at the big park, and after Hill told Weeden, she said "[O]kay." Weeden told Hill to ask Moore if he saw the boys at the park and if he saw the boys' gold car. Moore did not see the car.

Weeden told Hill to tell Moore to go to Caymus Park. Weeden then told Hill to ask Moore if he saw the boys at that park, and Moore said he saw a gold car. Weeden said, "[T]hat's them." Weeden told Moore there had been two or three boys in the car. Hill spoke to Melonson once or twice on Moore's phone. Moore hung up and Hill did not speak with him again that evening.

Later that evening, Melonson called Hill and told her to keep quiet if anyone asked questions and to turn off her phone. Angela told Hill someone had been shot. Hill tried to contact Moore but could not reach him. Hill also called Weeden, but Weeden had not heard from Moore. A week or two after the murder, Melonson called Hill and told her not to talk to the police.

**The Aftermath**

Sheriff's deputies responded to the shooting. Navnil sat bleeding and unresponsive in the front passenger seat. The Camry had broken glass and bullet holes on the passenger side.

Kumar lay on the floor of the store, covered in blood. Kumar told responders the shooting had occurred at a nearby gas station. He described the assailants as two dark-skinned black males wearing shorts.

Navnil suffered gunshot wounds to his back and hand. The fatal wound was caused by a bullet that entered his back and perforated his lung and heart. The entrance wound was irregularly shaped, which indicated the bullet struck something before entering Navnil's body. Navnil did not have drugs or alcohol in his system. Kumar had been shot in the finger, losing part of it.

**The Investigation**

Detectives Christopher Joachim and Grant Stomsvik were assigned to investigate the shooting. Their examination of the Camry revealed the car had very dark tinted windows, after-market rims, and low-profile tires.

The passenger-side windows were shattered and the car had four or five bullet holes. The right rear passenger window and the right front passenger window had bullet holes. Other bulletfront passenger window. Two of the bullets appeared to have been shot either as the car was moving away or the shooter was moving toward the rear of the vehicle.

The investigation also revealed damage to the Camry's interior. The windshield had been hit and blood was pooling in the center console area. A cell phone charger was plugged into the cigarette lighter. Copper jacketing from a bullet was also found inside the car.

Detectives found a bullet fragment on the driver's seat between the seat and the back cushion. In Detective Joachim's opinion, based on the physical evidence and witness statements, there was one shooter and one gun, and all the shots came from outside the vehicle.

The investigation also revealed Kumar's wallet on the Camry's floorboard. It contained a debit card but no cash.

Kumar talked to the police at the hospital. Although Kumar initially said the shooting took place at a supermarket gas station, he testified that he had lost a lot of blood and was not thinking clearly at the time.

The next morning, after police told Kumar about Navnil's death, Detective Stomsvik drove Kumar back to the park. Kumar told the detective that Navnil talked on his cell phone to a girl who told him to go to the park. Navnil told the girl he was at the park, and Kumar heard the girl reply that she could be there in two or three minutes. Kumar heard the girl tell Navnil to sit on a bench.

After Kumar parked, two men came up to the passenger-side window of his car. Kumar saw a gun come through the window, and the person said, "[G]ive me everything you have and step out of the car." As Navnil opened the door, he hit the man's arm.

The man fired one shot that Kumar thought hit the windshield. Kumar started to drive away as more shots were fired. The shooter was a fair-skinned Asian male, 18 to 20 years old, five feet nine inches tall with a heavy build, and wearing an orange shirt. However, Kumar could not identify either of the two suspects in a photo lineup.

The morning after the shooting, Doug Reid approached a deputy securing the crime scene at the park. Reid told the deputy he knew something about the shooting and took the deputy to his nearby home. Reid showed the deputy the wall that someone had scaled the previous evening.

The deputy drove around to the other side of the wall and discovered a revolver, a backpack, and a red sweatshirt in the vegetation along the wall. The backpack contained shorts, boxer shorts, a pencil, and razors. The DNA extracted from one of the razors matched Melonson's genetic profile.

The revolver held six rounds but contained only one casing when found. Officers found five empty shell casings loose on the curb. DNA extracted from the revolver's

6

grip contained a mix of DNA from at least three individuals.  Melonson was excluded as being a possible contributor to this mixture.

A forensic expert testified the bullet recovered from Navnil's body could not be matched to a particular gun because the bullet core did not make contact with the barrel of the weapon or the barrel's rifling.  Nor could the lead fragment recovered from Navnil's body be matched.

The forensic expert test-fired the revolver found by the wall to compare it with evidence found at the scene.  Three of the casings found by the wall were fired by the revolver.  Two other casings were likely fired by the revolver.  The copper jacketing found in the Camry was likely fired by the revolver.

**Melonson's Arrest**

About a month later, officers searched the home of Melonson's uncle, where Melonson sometimes stayed.  Officers found six boxes of Winchester .357-Magnum shells in the garage; five boxes were full, containing 50 cartridges, and one box contained only 48.  Melonson's uncle testified that his garage had been broken into months before and three boxes of shells were stolen.

One of Melonson's friends, Shakti Rana, owned a .357-caliber revolver, which looked like the gun found in the bushes near the park.  Melonson's brother, S.M., stated that Melonson and Rana shared a gun in July and August 2005 but denied the gun found in the bushes was the same gun.

Melonson's girlfriend, Julie G., had been dating him for about a year at the time of the shooting.  Julie gave Melonson a backpack, which he used to carry clothes and toiletries.  She identified the backpack found in the bushes as the backpack she gave Melonson.  Julie identified the shorts found in the backpack as belonging to Melonson.  That summer, Melonson told Julie someone had stolen his backpack.

Gabrielle Perez, a friend of Melonson, was driving home one evening in 2005 when she saw police in her neighborhood.  Later that night, Melonson sent Perez a text message stating he had "popped someone" and needed to talk.  Melonson called Perez the next morning and told her he shot someone and threw away his "piece."  He feared that if the police found it they would find him.  Cell phone records showed the text message was sent and the call was made on August 5 and August 6, 2005.  Melonson changed his phone number a few days later.

Melonson's friend Chris Butler moved from Sacramento to Denver, Colorado, in 2005.  While in Sacramento, Butler had a cell phone that did not provide service in Denver.  He got a new phone in Denver and left his prepaid cell phone with his girlfriend. Butler's girlfriend did not know Julie, Perez, Moore, Rana, or Hill.  Butler was in Denver from July to early September 2005.  He went to pick up Melonson at a bus terminal in Denver in November 2005, but officers arrested Melonson at the station.

When arrested at the bus station, Melonson was 20 years old, five feet seven inches tall, and 185 pounds.  Melonson carried a cell phone, prepaid calling card, and a one-way bus ticket to Denver in the name of "Mr. Brown."  During the booking process, Melonson told officers he was "not looking for the best deal in the world.  He was looking to make sure he got out of prison by the time he was 45 or 50."

The prosecution presented extensive evidence of numerous phone calls and text messages among the various parties.

**Cell Phone Calls**

Cell phone records for Navnil's, Weeden's, Melonson's, Moore's, Hill's, and Kumar's phones were introduced.[FN5]  The phone number for Melonson's phone was changed on August 6, 2005, and again on September 7, 2005.  Weeden changed her number after the murder.

> FN5. The subscriber on Melonson's phone was actually Chris Butler, who, as noted previously, had given the phone to Melonson when Butler moved to Denver.

Numerous phone calls were made by Navnil to Weeden beginning late on the evening of July 29, 2005, and ending on the night of the shooting.  The calls were very brief and many went straight to voice mail.

Late in the afternoon prior to the shooting, Navnil began calling Weeden from his cell phone.  There were also several calls to Weeden from Kumar's cell phone.  Navnil's cell phone blocked caller identification, preventing the recipient from identifying the caller.  Twenty-nine calls were placed to Weeden from Navnil's and Kumar's phones; she did not answer 13 of the calls.  The calls continued up until the time of the shooting.

Navnil called Weeden for the last time at 10:59 p.m., but Weeden was already on the phone with someone else and did not answer.  At 11:03 p.m., Navnil called 911.  Navnil made no calls to Melonson, Moore, or Hill.

Shortly after the first call from Navnil on the night of the murder, Weeden and Hill began calling each other.  There was a 41-minute phone call from Weeden's cell phone to Hill's home phone that ended at the time of the murder.  Immediately after the murder, there was a 26-minute phone call between Weeden's cell phone and Hill's cell phone.  Later in the evening there were a few brief calls between Weeden's cell phone and Hill's cell phone.  Weeden did not call Navnil or Melonson.

Moore first called Melonson the day before the murder.  Melonson returned the call.  Melonson called Moore at 6:07 the evening of the shooting.  There were 17 calls between Moore and Weeden on the night of the murder.  The calls began when Moore called Weeden at 9:30 p.m. and then called Melonson at 9:31 p.m.  The calls between Moore and Melonson ended at 10:06 p.m.  The calls between Moore and Weeden ended at 10:42 p.m.

Hill called Moore 18 times the night of the murder.  The calls began about 12 minutes before the murder and continued after the murder.  Moore never called Hill.

Cell phone tower data showed Moore's and Melonson's phones were being used in the area of the park between 10:00 and 11:00 p.m. the night of the murder.  Navnil's cell phone was in the vicinity of the park at 11:00 p.m.  Hill's and Weeden's cell phones were in a different part of town.

At 11:04 p.m., immediately after the murder, Melonson called Rana. Numerous calls between the two followed. Melonson also tried to call Perez one to two hours after the shooting. They spoke briefly the morning after.

**Text Messages**

In November 2005 Detective Joachim directed Moore to send a text message to Weeden over their cell phones. Another officer took a photo of each message.

Weeden told Moore she was moving to Los Angeles. Moore said, "[O]h, you movin' because of what happened with the Sirtice thingy," and Weeden answered, "Nah, I don't even really care about that, but den I kind of do because someone keep [sic] calling me saying they gonna kill me. I wasn't even the one that told on him."

Moore asked Weeden if she had told her father about what Moore had done. Weeden responded: "[N]o, all I told him was you my friend and you didn't do anything." Moore falsely told Weeden that in order to get a deal, Melonson had told the police about what she and Moore had done. Weeden asked what kind of deal Melonson made and if Moore was going to be arrested.

Moore said it was all Weeden's fault because she met the "hindus." Weeden responded: "[D]is ain't my fucking fault. Sirtice should [sic] have done what he did. He brought you into that by doing that. This shit wasn't my fault, so don't even fucking say it was." Weeden said, "[I]t's Angie's fucking fault, dummy. She da one that went to the car and gave them my number."

Moore replied: "[I]t was yo fucking idea to even rob them." Weeden denied this and blamed Angela, asking Moore, "Why you trying to put this on me? It wasn't my fucking idea. It was Angie's, so shut up. They already know it was."

Weeden continued: "I didn't set nuttin' up." She admitted knowing Melonson was going to rob the boys: "I already fuckin told them I knew Sirtice was going to rob them. They already know what I did. I told the truth, but I didn't set this up, okay." Weeden said she was "hella scared" and did not want either of them to go to jail.

Moore asked Weeden what she had told the police about the robbery and she replied: "I told them that someone told me to tell them to meet me at the park, and that Sirtice was gonna be there to rob them, but I didn't tell them who told me to set it up." Weeden blamed Hill, saying, "And you know dis all Janee fault because she told them some shit, then they got her phone records and mine den yours." Weeden advised Moore: "If you want to get out of this, you have to give up Angie's name."

**Statements by Participants**

***Angela G.***

In November 2005 Detective Joachim interviewed Angela about the night of the murder. Angela told the detective that Weeden was telling everyone about the previous meeting with Navnil, Kumar, and the other boys. She said the boys had weed and beer.

Weeden talked extensively to Moore about meeting the boys. Moore suggested they rob them. Weeden agreed and said, "[Y]eah, we should." Moore asked Weeden if

she had the "Hindu guy's" number and she told him he had her number.  Angela told Weeden not to do the robbery, but Moore said he and "Teze" should rob the boys.

After Angela passed the victim's car, she asked Weeden if they went through with the robbery.  Weeden denied it.  After the murder, Weeden did not want to discuss it over the phone.

### John W.

In December 2005 Detectives Joachim and Stomsvik interviewed John.  John indicated Weeden planned out the robbery.  He overheard Weeden telling Angela about someone Moore was going to rob.

### Janee Hill

Detectives also interviewed Hill in December 2005.  The day before the murder, Moore told Hill he was planning to rob someone.  Hill attempted to dissuade Moore by telling him robberies often end up in murder.  Moore agreed and told Hill he was not going to rob them.  Later Weeden told Hill that Melonson and Moore were going to commit the robbery.

The night of the shooting, Weeden called Hill and had her talk to Moore to find out where he was.  Moore or Melonson directed Hill to ask Weeden about what the boys were driving and which park they were going to.  Hill believed Weeden, Melonson, and Moore had the robbery planned before Hill became involved.  Initially Moore and Melonson went to a different park but relocated when they realized which park the boys were at.

### S.M.

In November 2005 Detective Stomsvik interviewed Melonson's brother S.M.  S.M. stated that Melonson and Rana bought a gun together.  He recognized the gun found in the bushes as Melonson's gun and the sweatshirt found in the bushes as a sweatshirt that he and his brother wore.  S.M. also identified the backpack, the razors, and the shorts as his brother's.

In a second interview, S.M. said he was at a park near Rana's house with Rana, Moore, and Shatez the night of the shooting.[FN6]  Moore gave his phone to Melonson, who sent a text message to Julie.  Melonson then gave the phone back to Moore.  At that time, Melonson was using two phone numbers: Butler had given him his phone after he moved.  The night of the murder, S.M. was not with Melonson but was "laser bowling" with friends and his brothers Idrice and Shatez.

FN6. Melonson's brother Shatez is referred to in the record as Shatez, Shateze, Tezi, and Tezzi.

Following the shooting, Melonson, Shatez, and Rana told S.M. he needed to find Rana's gun.  S.M. searched for the gun in the bushes three times after the murder.  Accompanied by Shatez, Moore, and John, S.M. failed in several attempts to find the gun.

***Shakti Rana***

A district attorney investigator interviewed Rana in July 2007.  Rana stated he and Melonson had a gun that they "passed back and forth."  Rana had the gun the day before the shooting, then gave it to Melonson because Melonson said he "wanted it for something."  Rana identified the gun found in the bushes as the gun he and Melonson shared.

The night of the shooting, Melonson called Rana and asked for a ride.  Melonson sounded shaky on the phone.  Rana picked up Melonson and another person who "looked nervous and stuff . . . . [¶] . . . [¶] . . . It looked like something went down."  According to Rana, "I knew something was wrong just the way he was acting . . . .  He was just real . . . I never seen him like that.  He was real shaky, panicky . . . ."

Melonson did not say much "because he was just on the hush-hush."  Although Melonson did not mention the murder, Rana stated, "[H]e knows what he did was wrong.  You know what I'm saying?  He knew that . . . we was good enough friends to know that he knew exactly what I meant by like how the hell you going to put me in a position without letting me know?"

. . . .

**Defense Case**

The defense called character witnesses who testified that Weeden's character was not consistent with someone who would set up a robbery.  Kim Gibson, a family friend who had known Weeden her whole life, testified Weeden did not have the character of someone who would set up a robbery.  Gibson described Weeden as a "generous, considerate, loving person."

Linda Matson, whose children Weeden babysat, also testified Weeden was not capable of planning a robbery because Weeden had "always been a very sweet person, very responsible, just nice, kind, not nobody that would do something like that."

Weeden's great-aunt testified that Weeden would not set up a robbery because she was a "kind, caring, bashful, shy, young lady, and she cares about others.  She's considerate.  She minds her parents.  She's just a good girl."  Weeden's grandmother echoed these sentiments, stating Weeden would not engineer a robbery because she was "much too caring and much too kind, considerate.  She would never do that."

*People v. Melonson*, Nos. C061352, C061800, 2013 WL 1987240, at \*1-10 (Cal. Ct. App. May 15, 2013).

Hill pled guilty to attempted robbery and agreed to testify in court.  Moore pled no contest to second-degree murder and admitted the firearm-use enhancement.  Weeden pled not guilty and denied the allegations.

11

Weeden and Melonson were tried jointly before separate juries. Both juries were empaneled to try the case on October 27, 2008. On December 3, 2008, the Melonson jury found him guilty of all counts and found true the enhancements alleged in the information. Two days later, a juror from Weeden's panel was discharged for misconduct and was replaced with an alternate. Five days after that, a second juror was discharged for bias, misconduct, and refusal to follow the court's instructions and was replaced by an alternate.

The same day that the second juror was replaced, the jury found Weeden guilty of first-degree murder and attempted second-degree robbery but not guilty of attempted murder.

On March 27, 2009, Weeden filed a motion for a new trial upon the grounds that: 1) jurisdiction of the superior court was improperly invoked; 2) trial counsel was ineffective for failing to call Weeden to testify and have Weeden examined by a psychologist; 3) Weeden was denied a fair trial by her inability to testify effectively due to her age and immaturity; 4) the jury should have been instructed that age is a proper consideration in assessing whether Weeden possessed the necessary mental state for robbery; 5) a juror was improperly excused for taking age into account; 6) a mistrial should have been declared because a juror improperly read a newspaper article about the Melonson verdict during deliberations; and 8) new information revealed that a juror was improperly seated. After hearing testimony from trial counsel and a psychologist, the court denied Weeden's motion.

The court sentenced Weeden to 25 years to life, plus 4 years in state prison: 25 years to life for first degree murder, plus one year for the firearm use enhancement; and 2 years, to be served consecutively, for attempted second degree robbery, plus one year for the firearm enhancement. *Melonson*, 2013 WL 1987240, at *11. The court imposed, and stayed pursuant to

12

California Penal Code § 654, 2 years for the robbery count plus 1 year for the firearm

enhancement.  *Id.*[1]

Through counsel, Weeden appealed her conviction, arguing that: 1) the trial court erred

by failing to instruct the jury that age is relevant to the mental elements of the attempted robbery

felony murder charge; 2) trial counsel was ineffective for failing to present the testimony of a

psychologist to establish that Weeden, due to her youth and immaturity, lacked the specific

intent to rob the victims; 3) the trial court erred by excusing a seated juror for taking into account

Weeden's age in the guilt determination; 4) the trial court erroneously denied Weeden's motion

for a new trial brought on the ground that she was denied her right to testify on her own behalf

by her youth and immaturity; 5) the trial court improperly instructed the jury that Weeden is

"equally guilty" of the crime if she aided and abetted; 6) the trial court erroneously denied

Weeden's mistrial motion brought on the ground that her right to confrontation was violated;

7) the superior court lacked jurisdiction over her due to her youth; 8) the life imprisonment

sentence is cruel and unusual punishment; and 9) sentencing errors required remand for further

proceedings.  The Court of Appeal affirmed the judgment in a reasoned, unpublished opinion

issued on May 15, 2013.  *Melonson*, 2013 WL 1987240, at *33.  Weeden petitioned for review

of that decision in the California Supreme Court, which was summarily denied on August 28,

2013.

Weeden timely filed a Petition for a Writ of Habeas Corpus to this Court on December

30, 2013.

---

[1]        Melonson was sentenced to an imprisonment term of life without the possibility
of parole, plus 50 years to life, plus 19 years and 4 months.  *Melonson*, 2013 WL 1987240, at
*11.

## II. GROUNDS/CLAIMS

In her counseled Petition, Weeden asserts the following 8 grounds for habeas relief which she unsuccessfully raised before the state courts on direct appeal: 1) the trial court erred in failing to instruct the jury that age is relevant to whether Weeden had the requisite mental state for the felony murder conviction; 2) counsel was ineffective for failing to present expert testimony that Weeden, due to her youth and immaturity, lacked the specific intent to rob the victims; 3) the trial court erred by excusing a seated juror; 4) Weeden was denied the right to testify on her own behalf by her youth and immaturity; 5) Weeden was denied due process and separation of powers because her case was filed in superior court rather than adjudicated through the juvenile system; 6) the trial court improperly instructed the jury that Weeden is "equally guilty" as an aider and abettor; 7) Weeden's right to confrontation was violated by testimony that one accomplice corroborated another accomplice; and 8) the imposed sentence is cruel and unusual.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that

14

are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). "Where there has been one reasoned

15

state judgment rejecting a federal claim, later unexplained orders upholding the judgment or

rejecting the same claim rest upon the same ground."  *Ylst v. Nunnemaker*, 501 U.S. 797, 803

(1991).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless

the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1);

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

<u>Instructional Error (Claims 1, 6)</u>

Weeden argues that the trial court made two instructional errors that warrant reversal of

her conviction.  A challenged instruction violates the federal constitution if there is a "reasonable

likelihood that the jury has applied the challenged instruction in a way that prevents the

consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380

(1990).  The question is whether the instruction, when read in the context of the jury charges as a

whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471

U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary

that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000);

*Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the

law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the

subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it

must violate some constitutional right, and it may not be judged in artificial isolation but must be

considered in the context of the instructions as a whole and the trial record.  *Estelle*, 502 U.S. at

72.  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is

whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn.  *Id.* at 72-73.  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation."  *Id*. at 73 (citation omitted). Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law.  *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  In those cases, the inquiry is whether the trial court's refusal to give the requested instruction "so infected the entire trial that the resulting conviction violates due process."  *Id.* at 156-57; *Estelle*, 502 U.S. at 72.

A.      Relevance of Age

In claim 1, Weeden contends that the trial court improperly denied her requested jury instruction that age is relevant to the mental elements of attempted robbery felony murder.  At trial, defense counsel requested an instruction "as to Ms. Weeden's age and how the jury could consider the developmental issues concerning a 14-year-old child."  *Melonson*, 2013 WL 1987240, at *18.  The trial court stated that it "would not be inclined to give a jury instruction concerning a 14-year-old because it appeared that the demarcation age [in the CALCRIM instructions] was ten."[2]  *Id.*  Weeden subsequently moved for a new trial on the basis that the

---

[2]      CALCRIM No. 330 states: "You have heard testimony from a child who is age 10 or younger.  As with any other witness, you must decide whether the child gave truthful and accurate testimony.  ¶  In evaluating the child's testimony, you should consider all of the factors surrounding that testimony, including the child's age and level of cognitive development.  ¶ When you evaluate the child's cognitive development, consider the child's ability to perceive, understand, remember, and communicate.  ¶  While a child and an adult witness may behave differently, that difference does not mean that one is any more or less believable than the other. You should not discount or distrust the testimony of a witness just because he or she is a child."

17

trial court failed to instruct on age as related to specific intent. *Id.* The court rejected the

argument, reasoning:

> Both then and now defense counsel has failed to provide any authority for this position. In fact, no sua sponte or other duty exists in law for this request. It is the Court's recollection that [defense counsel] used the defendant's age and evidence of good character, as testified to by family and close friends, to argue that the jury find her not guilty.

*Id.*

In her Petition before this Court, Weeden cites no federal law compelling the provision of

an age-related instruction in these circumstances, and indeed, the thrust of her claim appears to

be an attack on California state law's failure to include children over 14 years of age but under

15 as individuals for whom there is a rebuttable presumption of their incapability of committing

a crime. *See* CAL. PENAL CODE § 26. But federal habeas relief is not available for errors of state

law only. *See* 28 U.S.C. § 2254(a); *see also Estelle*, 502 U.S. at 67-68. "Claims that merely

challenge the correctness of jury instructions under state law cannot reasonably be construed to

allege a deprivation of federal rights." *Van Pilon v. Reed*, 799 F.2d 1332, 1342 (9th Cir. 1986);

*see also Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) ("Any error in the state

court's determination of whether state law allowed for an instruction . . . cannot form the basis

for federal habeas relief."); *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988) (an

instructional error "does not alone raise a ground cognizable in a federal habeas corpus

proceeding"). Thus, this instructional error claim is not cognizable on federal habeas review.

Moreover, the requested instruction was argumentative and therefore properly denied.

*United States v. Parker*, 991 F.2d 1493, 1497 (9th Cir. 1993) ("A 'theory of defense' instruction

need not be given when it is simply a recitation of the facts told from the defendant's

perspective.").  Because the requested instruction "invite[d] the jury to draw inferences favorable

to one of the parties from specified items of evidence, it is considered argumentative and

therefore should not [have] be[en] given."  *People v. Earp*, 978 P.2d 15, 54 (Cal. 1999) (citation

and internal quotation marks omitted).

As both the trial court and appellate court recognized, Weeden was able to ask the jury to

consider Weeden's age in determining her guilt through the use of witness testimony and

argument.  In rejecting this claim on direct appeal, the Court of Appeal noted:

> [D]efense counsel vigorously argued that because of her age, Weeden was
> incapable of planning a robbery and was susceptible to manipulation by others.  Counsel
> urged the jury "to put glasses on of a 14-year-old girl."  Counsel continued: "It's . . . easy
> as a 40-something individual looking back at life, knowing what's up, who to trust, fairly
> street smart, can smell a rat a mile away perhaps than [sic] a 14-year-old girl.  It's just
> different.  [¶] . . . [¶]  You're easily manipulated.  That's why as a society, we don't even
> let them decide who they can have sex with because they're too easily manipulated.
>  They can't make their own decisions whether they can drink or smoke because they're
> not smart enough, because they're too easily manipulated to decide who they can have
> sex with.  [¶]  But the Prosecution wants to charge her as an adult, under adult standards.
> But you can take into consideration, put on those glasses of a 14-year-old and tee, hee,
> hee, older boys want to talk to me and what should I do and let's send 'em on a wild good
> [sic] chase.  [¶]  That's a 14-year-old girl, it just is, and you get to put those glasses on.
> And it's [sic] easily manipulated by older people when she stepped into this mess of
> vipers.  [¶]  And blaming her for this is like blaming a child molest victim.  She's 14.
> She don't [sic] know what she's doing."

*Melonson*, 2013 WL 1987240, at *20.

Because the requested instruction was argumentative and not mandated by state law,

these were the proper procedures to ask the jury to consider Weeden's age.  Accordingly,

Weeden cannot prevail on this instructional error claim.

B.      Culpability of Aider and Abettor

Weeden also argues in claim 6 that the trial court improperly instructed the jury pursuant

to CALCRIM No. 400 that an aider and abettor is "equally guilty" of the crime as the

perpetrator.  Weeden contends that the instruction "shifted the burden of proof away from the prosecution; once the jury concluded that Melonson was guilty of robbery, [Weeden] was deemed also guilty of robbery, and therefore guilty of felony murder."

But as the Court of Appeals concluded on direct appeal, there is no likelihood that the jury applied this instruction in the manner suggested by Weeden in light of the other instructions given.  *Melonson*, 2013 WL 1987240, at *28.  "Here, the court instructed that Weeden was guilty of murder under the felony murder theory if she aided and abetted an attempted robbery; she intended to aid and abet the perpetrator in committing a robbery; if she did not personally attempt to commit robbery, then a perpetrator whom Weeden was aiding and abetting personally attempted to commit robbery; and while attempting to commit robbery, the perpetrator did an act that caused the death of another person. (CALCRIM Nos. 401, 540B.)"  *Id.*  Again, a jury is presumed to follow the instructions it is given, *Weeks*, 528 U.S. at 234, and this Court must therefore presume that the jury was able to correlate, follow, and understand the trial court's instructions.  In short, as the Court of Appeals stated, "it is not plausible that the jury would ignore the explicit instruction on the need to find intent and, instead, impute a finding of intent to Weeden."  *Melonson*, 2013 WL 1987240, at *28.

This Court agrees with the Court of Appeal that there is no basis to conclude that the jury's finding of guilt would have been any different had CALCRIM No. 400 been modified to delete any suggestion that the aider and abetter was "equally" guilty as the shooter.  *See Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) ("the defendant must show both that the instruction was ambiguous and that there was 'a reasonable likelihood' that the jury applied the instruction in a way that relieved the State of its burden of proving every element of the crime

beyond a reasonable doubt") (citations omitted).  For the same reasons, any possible error did

not "ha[ve] [a] substantial and injurious effect or influence in determining the jury's verdict."

*See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Nor can Weeden point to any authority of the United States Supreme Court that mandates

that a defendant's constitutional rights are violated when a jury is instructed in this manner.

Thus, the California courts' rejection of this jury instruction claim was not contrary to, or an

objectively unreasonable application of, any clearly established federal law, and did not involve

an unreasonable determination of the facts in light of the evidence presented.  Weeden is

therefore not entitled to relief on this instructional error claim either.

Ineffective Assistance of Counsel (Claim 2)

Weeden next contends that her counsel rendered ineffective assistance of counsel in

failing to present the testimony of a psychologist to establish that, due to her youth and

immaturity, she lacked the specific intent to rob the victims.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a

defendant must show both that his counsel's performance was deficient and that the deficient

performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one

in which "counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed by the Sixth Amendment."  *Id.*  The Supreme Court has explained that, if there is a

reasonable probability that the outcome might have been different as a result of a legal error, the

defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376,

1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at

393-95.  Thus, Weeden must show that defense counsel's representation was not within the

range of competence demanded of attorneys in criminal cases, and that there is a reasonable

probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill*

*v. Lockhart,* 474 U.S. 52, 57 (1985).

An ineffective assistance of counsel claim should be denied if the petitioner fails to make

a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697

(courts may consider either prong of the test first and need not address both prongs if the

defendant fails on one).

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's
> determination" under the *Strickland* standard "was incorrect but whether that
> determination was unreasonable—a substantially higher threshold."  And,
> because the *Strickland* standard is a general standard, a state court has even more
> latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v.*

*Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

It is through this highly deferential lens that a federal habeas court reviews *Strickland*

claims under the § 2254(d) standard.  *See Knowles*, 556 U.S. at 123 (citing *Yarborough v.*

*Gentry*, 540 U.S. 1, 5-6 (2003)).

In considering this claim on direct appeal, the Court of Appeal laid out the following

facts underlying Weeden's claim:

> Weeden moved for a new trial, arguing ineffective assistance based on trial
> counsel's failure to introduce psychological testimony.  In conjunction with the motion,
> appellate defense counsel included a psychological evaluation by Lisa Boal Perrine,
> Ph.D. Dr. Perrine interviewed Weeden twice following the verdict and conducted
> standardized psychological tests.
> Dr. Perrine concluded that although Weeden could comprehend the concept of
> robbery, "it is extremely unlikely she would intend to commit robbery or knowingly
> participate in one."  According to Dr. Perrine, Weeden would probably be slow to

understand that others were contemplating robbery if their intentions were not clearly articulated.

At the hearing on the new trial motion, trial counsel testified.  When asked about having Weeden examined by a psychologist, trial counsel responded: "I had contemplated it, and it was my opinion that it wouldn't necessarily have been helpful.  [¶] My opinion was regardless of what the doctor would have concluded, it would be inconsistent with the defense that I was putting forth."

Trial counsel admitted he did not know what conclusion a psychologist would reach, "[b]ut—for instance, if the doctor were to conclude that she was completely immature for instance and . . . easily manipulated, my concern would have been that the Prosecution would have used that to show that she didn't understand perhaps the magnitude of a robbery, but still participated in it.  [¶]  So I had some concerns that that could be twisted and turned against her."

Dr. Perrine testified that Weeden was unable to comprehend the concept of robbery or to understand that someone was contemplating a robbery.  Given Weeden's personality and behavioral history, it was extremely unlikely she would intend to commit or knowingly participate in a robbery.  Dr. Perrine also found Weeden to be a passive follower, unlikely to take the initiative.

The court denied the motion, reasoning: "Based on the [Weeden's] own declaration, she acknowledges that Ryan Moore said he wanted to rob the victim and wanted her to set up a meeting, but she did not agree to the plan.  She also denies that she set up the robbery plan.  Six days later she followed the advice of others to arrange to meet the victim, but not show up, so he would stop calling her.  She did not think Ryan Moore would follow through with the robbery plan because no one had mentioned it since the initial discussion some six days before.  Thus her intent does not appear to be at issue since she denies that she planned the robbery or agreed to it or had any conversation about it when she set the victim up."  The court found trial counsel's considered decision "to have been a sound tactical decision and furthermore it does not appear to have been prejudicial in any event."

*Melonson*, 2013 WL 1987240, at *20-21.

Weeden argues in her Petition that counsel's decision not to have her examined by a psychologist was not a sound tactical decision.  But the thorough decision of the Court of Appeal rejecting Weeden's claim that the trial court erred by declining her motion for a new trial based on her ineffective assistance of counsel allegations is not contrary to or an unreasonable application of clearly established federal law, nor is it based on an unreasonable determination of the facts in light of the circumstances.  As the state appellate court explained:

> [T]rial counsel pursued the defense that Weeden did not set up the robbery or
> agree to it.  The testimony Weeden claims counsel was ineffective in failing to present
> might well have undermined this defense.  Among Dr. Perrine's findings was that
> Weeden had a strong tendency to be a passive follower, which might have led the jury to
> conclude that she did not initiate the robbery but, sheep-like, went along with it.

*Melonson*, 2013 WL 1987240, at *21.

Thus, the tactical decisions exercised by counsel at trial were reasonable and within the

bounds of the discretion afforded to him.  *See Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th

Cir. 2001) ("In determining whether the defendant received effective assistance of counsel, we

will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of

hindsight, but rather, will defer to counsel's sound trial strategy." (citation and internal quotation

marks omitted)).  Because the psychiatric evidence may have undercut counsel's primary

defense at trial, counsel cannot be found deficient for choosing not to present it.  *See, e.g.*,

*Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir. 1998) (defense counsel not ineffective for

failing to present psychiatric evidence that would have contradicted the primary defense theory

of misidentification); *Fritchie v. McCarthy*, 664 F.2d 208, 215 (9th Cir. 1981) (counsel not

ineffective for choosing not to present evidence of petitioner's diminished capacity that would

have undermined primary defense theory of mistaken identity).  Consequently, Weeden has

failed to overcome the significant burden of demonstrating that trial counsel's performance fell

below professionally acceptable standards.  Accordingly, Weeden is not entitled to relief on her

ineffective assistance of counsel claim.

Improper Juror Removal (Claim 3)

Weeden additionally argues that the trial court erred by excusing a seated juror.  In considering this claim on direct appeal, the Court of Appeal recounted the following underlying facts:

> During deliberations, the jurors sent the trial court a note stating information about the Melonson verdict had been divulged, although not all jurors were privy to the information.  The trial court questioned the jury foreperson about the issue.  The foreperson explained that Juror No. 4 read an article on the codefendant's verdict and mentioned it to Juror No. 11.  No other jurors participated in the conversation.  The foreperson stated she would decide the case on its merits, putting aside anything Juror No. 4 said about the article.
>
> Juror No. 4 acknowledged reading the article about Melonson and discussing it with Juror No. 11.  Juror No. 11 stated that Juror No. 4 told him about the Melonson verdict in order to bully him into changing his opinion.  Juror No. 11 believed he could continue to deliberate and be fair to both sides but acknowledged he could not set the information aside, although he would try not to let it affect him.
>
> The court dismissed Juror No. 4 for misconduct.  The prosecution asked that Juror No. 11 also be dismissed.  Although the court denied the request, it noted Juror No. 11 "is now aware that the Melonson jury has convicted him of the attempted robbery counts, and I can certainly see from the Defense perspective that having that information is not helpful."  The court offered to excuse Juror No. 11 if requested by the defense.  The defense declined the offer.
>
> After Juror No. 4 was replaced, deliberations continued.  Subsequently, the jury sent the court a note stating: "Some statements were made by 1 juror that he could not convict a child.  Those statements have been weighing heavily on the majority.  He also is very sympathetic to the outcome of a particular conclusion & what will happen to the defendant.  No notes were taken however he did write 'Jesus loves you.'  When aske[d] to recall what his notes said he stated he had none & then grabbed another juror[']s notepad.  Today he even went as far as saying to note [sic] & he would go along w/ the majority just to go home.  Then he backed [sic] tracked & disagreed.  He is too hung up on the age of defendant."
>
> After receiving the note, the court questioned Jurors Nos. 2, 3, 5, 8, and 12 about the note.  Juror No. 8 stated that, on the first day of deliberations, Juror No. 11 stated he "cannot convict a child, he cannot sleep at night, he cannot hold that in his heart."  Juror No. 8 also stated: "[I]t's affecting us because we know that, the reasoning isn't there for whatever decisions are being brought to the table."  Jurors Nos. 2, 3, 5, and 12 heard Juror No. 11 say he could not convict a child.  Although his fellow jurors asked him to explain his opinion, Juror No. 11 failed to provide any explanation.
>
> The jurors reminded one another that they were to deliberate free of bias and prejudice.  Juror No. 2 stated that someone asked Juror No. 11 if he was biased, "And at first he didn't answer.  He just asked back.  [¶]  Are you biased?  [¶]  And they said no. [¶]  And then he said well, I am.  [¶]  And that was just yesterday."

During deliberations, Juror No. 11 expressed concern about possible punishment, stating, "[T]his is a capital murder case." Juror No. 11 was very worried about someone convicted of murder being sentenced to life in prison. He discussed punishment for five days and was the only juror who repeatedly brought up the issue. Juror No. 11 refused to listen to the other jurors' advice to not consider punishment.

Juror No. 11 said he did not need to review his notes because he remembered everything. However, Juror No. 11 took Juror No. 3's notes to refresh his memory. Juror No. 3 stated that Juror No. 11 asked, "[W]hat did you write down?" and Juror No. 3 allowed him to see his notebook. Juror No. 11 had written "Jesus Loves You" in his notebook and drawn a "happy face."

The day before the hearing, Juror No. 11 told the others he would go along with them just to go home. However, his fellow jurors said he could not do that. Juror No. 11 began discussing Weeden's age, expressing concern about her youth. He refused to give any facts supporting his statements.

During the hearing, the trial court said to Juror No. 11, "It's indicated that you've made comments that you cannot convict a child."

"[Juror No. 11:]  No, that's not true.

"[Court:]  You did not say that[?]

"[Juror No. 11:]  No, I did not.

"[Court:] It's also been indicated to me that you are very sympathetic to the outcome of a particular conclusion and what will happen to the defendant.  [¶]  Have you voiced those types of concerns to the jury?

"[Juror No. 11:]  We've talked about the law and what felony murder is.

"[Court:]  Have you discussed the punishment?

"[Juror No. 11:]  No.

"[Court:]  No discussions about the punishment.

"[Juror No. 11:]  No.

"[Court:]  Okay.  It's also been indicated to me that at some point . . . you did not take notes evidently during the trial, but had written down in your notebook 'Jesus Loves You'.

"[Juror No. 11:]  Yes.

"[Court:]  Is that true?

"[Juror No. 11:]  Yes, it is true, your Honor.

"[Court:]  Okay.  And when you were asked to recall what your notes said, that you stated that you had none, and then you grabbed another juror's notepad.

"[Juror No. 11:]  No. That's a lie.

"[Court:]  That's a lie.  [¶]  It's indicated to me that at some point in time yesterday, that you said you would vote a certain way just to go along with the majority, but then you backtracked and disagreed.

"[Juror No. 11:]  Yes."

Following this colloquy, the trial court observed that someone was not telling the truth, "and it is my observation, based on the demeanor, the specifics, the nature of the allegations, that I'm of the view that Juror [No. 11] is untruthful."  In addition, the court

found Juror No. 11 engaged in repeated instances of misconduct and exhibited bias in favor of Weeden based on her age.

The court found the other jurors "extremely credible" and did not believe Juror No. 11's denials. Juror No. 11, the court believed, was incapable of following the court's instructions, particularly those related to penalty and punishment. The court determined Juror No. 11 "should be removed from this jury for repeated instances of misconduct and failure to follow the Court's instructions, and I would make the further finding that he is biased."

In response, defense counsel requested that the court interview the remaining jurors in an effort to confirm Juror No. 11's version of events. Following a recess to allow the court to research the issue, the court denied the request, finding it an unnecessary intrusion on the deliberative process.

The court found the jurors interviewed to be especially credible. As to defense counsel's concerns that Juror No. 11 had been bullied, the court found the jurors who came forward did not do so gleefully or with any motive other than a desire to deliberate as instructed. The jurors were very concerned that, despite their best efforts, Juror No. 11 was unable to set aside his biases and decide the case on the facts. The court found no bullying of Juror No. 11; instead, the other jurors asked Juror No. 11 to cite specific facts, which he was unable to do. When Juror No. 11 offered to vote with the others, the jurors dissuaded him from such inappropriate behavior. The court concluded these facts undermined and contradicted any claim of bullying during deliberations.

The court found Juror No. 11 lied to the court and willfully disregarded the court's instructions. Since Juror No. 11 was unable to perform his duties within the meaning of section 1089, the court removed the juror and replaced him with an alternate.

In her motion for a new trial, Weeden argued Juror No. 11's removal was improper. Weeden submitted a declaration from a private defense investigator stating: "I spoke with juror [name redacted]. He informed me that juror [No. 11] had engaged in deliberations and had not refused to deliberate . . . .  I contacted him again and asked for his signature on a declaration. He declined to sign a declaration and stated that he wanted to put the whole matter behind him." The court denied the motion.

*Melonson*, 2013 WL 1987240, at *22-24.

Criminal defendants in state trials have a right to a fair and impartial jury under the Sixth and Fourteenth Amendments. *Duncan v. Louisiana*, 391 U.S. 145, 148-49 (1968); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). The "essential feature" of a jury consists of "the interposition between the accused and his accuser of the commonsense judgment of a group of laymen." *Williams v. Florida*, 399 U.S. 78, 100 (1970). The Ninth Circuit has found constitutionally valid the procedure used in California criminal trials to substitute for good cause an alternate juror for

a regular juror under Penal Code § 1089.[3]  *Miller v. Stagner*, 757 F.2d 988, 995 (9th Cir. 1985),

*amended on other grounds by Miller v. Stagner*, 768 F.2d 1090 (9th Cir. 1985) ("The California

substitution feature followed by the trial court [under § 1089] preserved the 'essential feature' of

the jury required by the Sixth and Fourteenth Amendments." (quoting *Williams*, 399 U.S. at

100)).

   To the extent that Weeden contends that the trial judge abused his discretion under state

law to dismiss the juror, such a contention is not cognizable on federal habeas review.  *See*

*Estelle*, 502 U.S. at 67.  Accordingly, the only question raised by a federal habeas claim

challenging a trial court's application of § 1089 in a particular case is whether the removal of the

juror violated the Sixth Amendment, which depends on whether there was good cause for the

removal.  *See Perez v. Marshall*, 119 F.3d 1422, 1426 (9th Cir. 1997) (noting that because *Miller*

found that § 1089 was constitutional on its face, the sole inquiry was whether the substitution

violated petitioner's Sixth Amendment rights in light of the trial court's finding of good cause).

Review of the state court's findings regarding a juror's fitness in this regard is entitled to

"special deference."  *Id.* at 1426 (citing *Patton v. Yount*, 467 U.S. 1025, 1036-38 & n.12 (1984)).

---

[3]   That section provides in relevant part:

   If at any time, whether before or after the final submission of the case to the jury,
a juror dies or becomes ill, or upon other good cause shown to the court is found to be
unable to perform his or her duty, or if a juror requests a discharge and good cause
appears therefor, the court may order the juror to be discharged and draw the name of an
alternate, who shall then take a place in the jury box, and be subject to the same rules and
regulations as though the alternate juror had been selected as one of the original jurors.

CAL. PENAL CODE § 1089.

As an initial observation, although it may be argued that Juror No. 11 was the lone holdout juror, the record demonstrates that the trial court was clear that it did not consider Juror No. 11's possible verdict in its inquiry or decision or inquire as to his possible verdict. Rather, the trial court's examination focused on Juror No. 11's truthfulness and ability to deliberate. The appellate court's conclusion that Juror No. 11's disqualification was established is well-supported by the factual record and is a reasonable interpretation of the facts as they were presented in the state court proceeding. *See Perez*, 119 F.3d at 1427-28 (affirming denial of habeas writ where state court's good cause determination pursuant to § 1089 was supported by the factual record). The trial court properly discharged Juror No. 11 based on lack of credibility, bias, and a resulting inability to fairly and impartially perform deliberation. *Id.* at 1427.

Moreover, in gathering information from jurors, the trial court was careful to avoid impermissibly intruding into the substance of deliberations. Accordingly, based on this record, there was no constitutional error in excusing Juror No. 11, and habeas relief is not warranted on this claim.

Denial of Right to Testify (Claim 4)

Weeden also claims that the trial court erred in denying her motion for a new trial brought on the ground that she was denied the right to testify on her own behalf based on her youth and immaturity.

In moving for a new trial, Weeden claimed that defense counsel deprived her of her constitutional right by advising her not to testify. Again, a tactical decision exercised by counsel deserves deference when counsel makes an informed decision based on strategic trial considerations and the decision appears reasonable under the circumstances. *See Sanders v.*

29

*Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  On the other hand, "it cannot be permissible trial strategy, regardless of the merits or otherwise, for counsel to override the ultimate decision of a defendant to testify contrary to his advice," *United States v. Mullins*, 315 F.3d 449, 453 (5th Cir. 2002), because "a defendant in a criminal case has the right to take the witness stand and testify in his or her own defense," *Rock v. Arkansas*, 483 U.S. 44, 49 (1987).  A defendant may, however, waive this right, either explicitly or implicitly.  *See United States v. Pino-Noriega*, 189 F.3d 1089, 1094 (9th Cir. 1999).  Such a waiver may be inferred from a defendant's failure to testify at trial or to notify the trial court of his desire to testify.  *See id.* at 1094-1095.  "Although the ultimate decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical decision not to testify," unless he "reject[s] his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer."  *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993).

Here, Weeden has failed to demonstrate that counsel rendered prejudicially ineffective assistance by advising her to waive her right to testify on her own behalf.  The record does not indicate that Weeden ever expressed to the trial court that she intended or desired to testify over counsel's objections or advice.  While Weeden may now wish, with the benefit of hindsight, that she had testified at trial, the record reflects that Weeden voluntarily waived that right.

Weeden also argued in her motion for a new trial that her immaturity rendered her incompetent to testify.  The Court of Appeal rejected this claim on direct appeal, concluding:

> [T]he court found Weeden at all times appeared to be "fully competent and engaged in the trial proceedings."  Although trial counsel described Weeden as "a little girl in every since [sic] of the word" and lacking in maturity and sophistication, we cannot second-guess the trial court, who was in the best position to observe and evaluate Weeden's competence.

Moreover, Weeden's academic performance did not reflect any mental defect impinging on her ability to testify.  Her grades were improving, she performed well on tests in preparation for her GED (general educational development) test, and one teacher described her as self-motivated and responsible.

The court, in denying the motion for a new trial, found Weeden "a little bit more manipulative and a little bit more sophisticated than those that know her the best and love her the most will accord."  Based on this record we cannot find the court erred in rejecting Weeden's claim that she was incompetent to testify.

*Melonson*, 2013 WL 1987240, at *27.

Weeden argues in her Petition before this Court that the appellate court's rejection of her claim that she was incompetent to testify was unreasonable because "[t]he state trial court could not know whether she was able to testify effectively or not.  There was no foundation for the conclusion of the state court of appeal on this issue."  Under § 2254(e)(1), however, a trial court's finding as to the competency of a witness to testify is presumed correct and may be rebutted only with the presentation of clear and convincing evidence.  *See Haliym v. Mitchell*, 492 F.3d 680, 700 (6th Cir. 2007) (state court finding that 6-year-old witness was competent to testify presumed correct); *cf. Dennis v. Budge*, 378 F.3d 880, 891-92 (9th Cir. 2004) (state court competency determinations of criminal defendants presumed correct).  Weeden fails to provide any evidence that would rebut the presumed correctness of trial court's factual finding.  Consequently, Weeden cannot prevail on this claim.

Improper Jurisdiction (Claim 5)

Weeden next asserts that Weeden's case should have been adjudicated in the juvenile system rather that directly filed in criminal court.  The Court of Appeal rejected this claim on direct appeal, concluding that "Weeden was charged with felony murder, a murder in connection with a bungled robbery.  This offense subjected Weeden to the possibility of life in prison if she

had been an adult at the time of the crimes.  (§ 190.2, subd. (17)(a).)[4]  Therefore, the district

attorney had the discretion to charge Weeden as an adult."  *Melonson*, 2013 WL 1987240, at

*29.

The United States Supreme Court has defined specific rights applicable to juvenile

offenders.  *See, e.g., Miller v. Alabama*, 132 S. Ct. 2455, 2467 (2012) (holding that it is

unconstitutional to sentence a juvenile to life without possibility of parole in a capital case);

*Graham v. Florida*, 560 U.S. 48, 75 (2010) (holding that it is unconstitutional to sentence

juvenile offender to life without possibility of parole in a non-capital case); *Roper v. Simmons*,

543 U.S. 551, 575 (2005) (holding that death sentence for juveniles under the age of 18 is

unconstitutional).  But the Supreme Court has not specifically addressed whether juveniles have

a right to a juvenile fitness hearing or whether a defendant who was a juvenile at the time of the

offense may be tried as an adult.  In both *Miller* and *Graham*, the Supreme Court discussed,

without considering their validity or constitutionality, juvenile transfer proceedings and how in

some states prosecutors determine without judicial oversight whether the juvenile is tried as an

adult in criminal court or in juvenile court.  *Miller*, 132 S. Ct. at 2474-75; *Graham*, 560 U.S. at

74-80.  However, these cases addressed only the constitutionality of sentencing issues, discussed

*infra*.  There is therefore an absence of Supreme Court precedent as to whether a juvenile

defendant may be trial as an adult, and Weeden fails to cite any authority suggesting that her

constitutional rights were violated under these circumstances.  Accordingly, Weeden's

---

[4]        Proposition 21, as approved by voted in March 2000, amended Welfare and Institutions Code § 707(d) to give a prosecutor the discretion to prosecute a minor either in criminal court or in juvenile court when "[t]he minor is alleged to have committed an offense that if committed by an adult would be punishable by death or imprisonment in the state prison for life."  CAL. WELF. & INST. CODE § 707(d)(2)(A).

jurisdictional claim fails to raise a federal question. *See* 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67-68; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law."); *see also Carey*, 549 U.S. at 77. Accordingly, Weeden is not entitled to relief with respect to this claim.

Confrontation Violation (Claim 7)

Weeden also argues that her confrontation rights were violated by testimony that one accomplice corroborated another accomplice. When considering this claim on direct appeal, the Court of Appeal recounted the following facts underlying the claim:

> During the trial, Detective Stomsvik testified about his interview with Angela. He stated she began to provide information about Weeden and Moore. Detective Stomsvik testified, "About halfway into the interview when Detective Joachim confronted her with the fact that Ryan Moore had confessed, things changed."
> On cross-examination, Melonson's counsel did not ask Detective Stomsvik about his interview with Angela. Weeden's counsel did question the detective about the interview: "Q[:] Okay. With respect to Ryan Moore's ever evolving confessions, let me ask you some questions with respect to Angela [G.'s] statements.
> "First of all, you would agree that one of the tactics of law enforcement when interviewing a witness might be to feed them false information to see what they're going to say; is that true?
> "A[:] Are you asking did I do that to Angela [G.], or is that just a plain tactic that could be used by law enforcement?
> "Q[:] Make it so clear. Is it a tactic for law enforcement to feed false information to witnesses to see what they will say, yes, it is, no, it is not.
> "A[:] It can be, yeah.
> "Q[:] In respect to in this case with Angela [G.], at some point you said, hey, Ryan had made a statement about being involved in the robbery, correct"?
> "A[:] Correct.
> "Q[:] Then she says, I heard Ryan say they should rob the victims, correct?
> "A[:] I think she said that, but said, I wasn't sure who said that first, if it was Ryan or Sarah, I think."
> Out of the jury's presence, the court discussed Weeden's counsel's objection to Detective Stomsvik's testimony. The court observed that the testimony was not solicited

by questioning, but "volunteered by the way of a somewhat nonresponsive answer concerning Detective Joachim indicating to Angela [G.] that Ryan Moore had, quote, confessed, and thereafter Angela [G.'s] statements became more consistent."

Both defendants' counsel moved for a mistrial.  Weeden's counsel stated Detective Stomsvik's mention of Moore's confession could lead to the inference that the confession implicated Weeden.  Melonson's counsel echoed these fears.

The prosecutor stated Detective Stomsvik's response was unexpected but argued a cautionary instruction would mitigate the harm.  When asked by the court whether he would refer to Moore's confession in closing argument, the prosecutor said no.

The court denied the motion, stating: "I did give the jury a limiting instruction that defense counsel had requested.  And in part, the admonition given stated thusly, thus the statements by Detective Joachim are not themselves evidence, and the contents of these statements may not be considered by you as evidence against either of the charged defendants.  [¶]  And the sentence preceding that admonition was as follows, law enforcement officers are permitted to lie to criminal suspects and to pretend that they are in possession of particular facts when they may not be.  [¶]  I believe out of the entire totality of the circumstances with Detective Stomsvik's testimony this morning, and the fact that Mr. Bowman also clarified that this [is] a typical law enforcement tactic, I think it does not rise to the level of such a due process violation where it has not created such an unfairness in this trial that would warrant a mistrial at this time, and so I would deny the motion for mistrial.  [¶]  I will certainly reinstruct the jury on this point, counsel, if either one of you want me to do that during the final instructions."  Weeden's counsel commented: "Your Honor, I think that would be satisfactory."

*Melonson*, 2013 WL 1987240, at *16.

The Confrontation Clause of the Sixth Amendment mandates that a criminal defendant has the right to confront and cross-examine the witnesses against him.  *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987).  This generally means that out-of-court testimonial statements by a witness are not admissible against a defendant unless the witness is available for cross-examination at trial or the defendant had an opportunity to cross-examine the witness about the statements before trial.  *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  This rule applies with equal force to statements by a non-testifying accomplice or co-participant.  *See Bruton v. United States*, 391 U.S. 123, 135-36 (1968) (holding that the admission of a statement of an accomplice or co-participant that implicates a defendant violates the defendant's Sixth

Amendment rights when the defendant has no opportunity to cross-examine the co-participant). This is true even when the accomplice is not tried with the defendant. *Douglas v. Alabama*, 380 U.S. 415, 418-20 (1965).

Where, however, the accomplice's statement does not directly implicate the defendant—i.e., the statement is "not incriminating on its face, and [becomes] so only when linked with other evidence introduced later at trial"—the Constitution does not prohibit the introduction of the statement. *Richardson v. Marsh*, 481 U.S. 200, 208 (1987); *see also Mason v. Yarborough*, 447 F.3d 693, 695 (9th Cir. 2006) (noting that *Bruton* "specifically exempts a statement, not incriminating on its face, that implicates defendant only in connection to other admitted evidence").

In this case, Weeden argues that Detective Stomsvik's testimony about Moore's confession and Grace's subsequent statements led the jury to conclude that Grace "aligned her pre-trial statement with Ryan Moore's confession, and it could be easily inferred from that alignment that Ryan's confession, like Angie's statement, had included an accusation by Ryan that [Weeden] was in on the robbery plan."

No *Bruton* error occurred here. While *Bruton* forbids the admission of statements made by an accomplice that implicate the defendant, *Bruton*, 391 U.S. at 126, 135-56, the statement that Moore confessed did not implicate Weeden in the criminal activity. As the appellate court recognized, "Detective Stomsvik briefly mentioned Moore's confession; he did not disclose Moore's words." *Melonson*, 2013 WL 1987240, at *18. For the jury to infer that Moore implicated Weeden in his confession, the jury would have to rely on other evidence introduced at

trial; the statement therefore falls outside of *Bruton*.  *See Richardson*, 481 U.S. at 208; *see also Mason*, 447 F.3d at 695.

In any event, a *Bruton* claim, like other Confrontation Clause claims, is subject to harmless error analysis.  *Lilly v. Virginia*, 527 U.S. 116, 139-40 (1999); *Harrington v. California*, 395 U.S. 250, 254 (1969).  In light of the evidence presented at trial, Weeden cannot demonstrate that the challenged testimony was significantly important to the jury's verdict, particularly given that the jury could plausibly have inferred that Moore did not implicate Weeden in his confession at all.  Moreover, the testimony was brief, not a central focus of the prosecution's case, and not mentioned by the prosecution in closing argument.  In sum, the admission of Detective Stomsvik's testimony about Moore's confession and Grace's subsequent statements, which was not facially incriminating towards Weeden, did not have a substantial and injurious effect or influence in determining the jury's verdict.  *Brecht*, 507 U.S. at 638.  Weeden therefore cannot prevail on her confrontation claim.

Cruel and Unusual Punishment (Claim 8)

Finally, Weeden contends that her sentence of 25 years to life imprisonment violates the Eighth Amendment's prohibition against cruel and unusual sentences. Weeden argues that the life imprisonment sentence is unfair in light of her young age and the fact that her felony murder conviction was for a crime that was "only technically" a homicide crime.

The Eighth Amendment, applicable to the States through the Fourteenth Amendment, proscribes the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII; *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008). In determining whether to infer gross disproportionality, a federal court should examine whether a petitioner's sentence is justified by the gravity of his triggering offense and his criminal history, a process similar to the three-pronged approach employed by California state courts. *See Ramirez v. Castro*, 365 F.3d 755, 768 (9th Cir. 2004). Where the crime is murder, even a life sentence without parole is not grossly disproportionate. *See Harris v. Wright*, 93 F.3d 581, 584 (9th Cir. 1996) (life imprisonment without possibility of parole for aggravated first-degree murder raises no inference of gross disproportionality); *United States v. LaFleur*, 971 F.2d 200, 211 (9th Cir. 1991) ("Under *Harmelin* [*v. Michigan*, 501 U.S. 957 (1991)], it is clear that a mandatory life sentence for murder does not constitute cruel and unusual punishment."). Furthermore, while the contours of the "gross disproportionality principle" have been called "unclear," the principle is applicable only in the "exceedingly rare" and "extreme" case. *Lockyer v. Andrade*, 538 U.S. 63, 72-73 (2003); *see also Rummel v. Estelle*, 445 U.S. 263, 272 (1980) ("Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.").

Within the last several years the United States Supreme Court has considered a number of Eighth Amendment cases involving juvenile offenders, that is, defendants who were under the age of 18 at the time they committed their offenses.  In *Roper*, 543 U.S. at 575, the Supreme Court held that "the death penalty is disproportionate punishment for offenders under 18."  The Supreme Court subsequently held in *Graham*, 560 U.S. at 75, that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide."  In *Miller*, 132 S. Ct. at 2467, a case involving a juvenile who was 14 years old at the time he committed a murder, the Supreme Court held that a mandatory sentence of life without the possibility of parole violates the Eighth Amendment where a sentencing court has no discretion to consider the defendant's youth or other "mitigating qualities."  The Supreme Court's recent jurisprudence regarding juveniles does not, however, warrant granting Weeden relief here because she was not sentenced to the death penalty or life without parole and thus her sentence, which includes the possibility of life imprisonment, does not run afoul of existing Supreme Court authority.

In support of her claim, Weeden cites California cases in which the California Supreme Court held that potential life sentences imposed on youthful offenders constitutes cruel and unusual punishment.  However, in light of the applicable United States Supreme Court authority, it was not unreasonable for the state court to conclude that neither the fact that Weeden was guilty of felony murder rather than direct murder nor her age at the time of the offense rendered her sentence disproportionate to her crimes.  *See Harmelin*, 501 U.S. at 1004 (Kennedy, J., concurring) (stating that "no sentence of imprisonment would be disproportionate" for the crime of felony murder even though it does not require the specific intent to kill (quoting *Solem v.*

38

*Helm*, 463 U.S. 277, 290 n.15 (1983))); *see also Martinez v. Duffy*, No C-13-5014, 2014 WL 547594, *1-2 (N.D. Cal. Feb. 7, 2014) (finding that a sentence of 25 years to life for murder as an aider and abettor committed when the petitioner was 17 years old was not cruel and unusual and thus concluding that a state court decision to that effect did not warrant relief pursuant to § 2254(d)); *Khalifa v. Cash*, No. ED CV 10-1446, 2012 WL 1901934, at *30-33 (C.D. Cal. Apr 10, 2012) (finding that a sentence of 25 years to life for first degree murder did not violate the Eighth Amendment where the petitioner was 15 years old at the time of his offense and was not the actual murderer but was only a lookout for the underlying felony which resulted in a murder), *report and recommendation adopted*, 2012 WL 1901932 (C.D. Cal. May 24, 2012)).

In short, the Court of Appeal's finding that the trial court's sentence was not grossly disproportionate to the crime for which Weeden was convicted in light of the circumstances of the instant offense was not contrary to, or an objectively unreasonable application of, any clearly established federal law and was not based upon an unreasonable determination of the facts in light of the evidence presented.  Accordingly, Weeden is not entitled to habeas relief on her Eighth Amendment claim.

## V. CONCLUSION AND ORDER

Weeden is not entitled to relief on any ground raised in her Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree

with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: November 26, 2014.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge